IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT L. COOK, JR.          :          CIVIL ACTION
                             :
          v.                 :
                             :
TOM CORBETT, et al.          :          NO. 14-5895

MEMORANDUM

Bartle, J.                                    July 8, 2015

          Plaintiff Robert L. Cook, Jr. ("Cook"), an inmate at

Pennsylvania's State Correctional Institution at Graterford

("SCI Graterford"), has sued Pennsylvania Governor Tom Wolf

("Wolf"), former Pennsylvania Governor Tom Corbett ("Corbett"),

Pennsylvania Department of Corrections ("DOC") Secretary John

Wetzel ("Wetzel"), and SCI Graterford Superintendent Michael

Wenerowicz ("Wenerowicz").[1]  Cook alleges that he has been

confined to death row in the prison's restricted housing unit

("RHU") since 1988, even though his death sentence was vacated

in 2003 and he has yet to be resentenced.  Cook claims liability

against all defendants under 42 U.S.C. § 1983 for violations of

his rights under the First, Eighth, and Fourteenth Amendments to

the United States Constitution.[2]  He seeks declaratory and

injunctive relief as well as compensatory and punitive damages.

_____

1.  Defendants Corbett, Wetzel, and Wenerowicz are sued in their
individual and official capacities.  Defendant Wolf is sued in
his official capacity.

2.  We note that the rights guaranteed by the First and Eighth
Amendments exist through incorporation via the due process

On December 15, 2014, defendants moved to dismiss Cook's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Cook responded to their motion on January 7, 2015, and then on May 1, 2015 filed a "Pro Se Supplement" to his amended complaint.  In light of this "Pro Se Supplement," we denied as moot defendants' December 15, 2014 motion.  On May 11, 2015 defendants filed a motion to dismiss Cook's Amended Complaint as supplemented by his "Pro Se Supplement."  That motion, to which Cook has filed no response, is now before the court.  Because the two motions filed by defendants are similar in all relevant respects, we will construe Cook's response to their now-moot first motion to dismiss as a response to their second motion to dismiss.

I.

When deciding a motion to dismiss under Rule 12(b)(6) the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible

---

clause of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.

on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim must do more than raise a "mere possibility of misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

On a motion to dismiss for failure to state a claim, the court may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

## II.

The following facts are taken from Cook's Amended Complaint as supplemented by his "Pro Se Supplement to Plaintiff's First Amended Complaint" and from the public record. The facts are construed for present purposes in the light most favorable to Cook.

Cook was sentenced to death in 1988 for first-degree murder and placed in the RHU in Pennsylvania's State Correctional Institution at Greene. In 2003, his death sentence

-3-

was vacated by the Court of Common Pleas of Philadelphia County and a new penalty hearing was granted.  No new trial was granted as to his guilt.  In 2005, the DOC transferred Cook to SCI Graterford.  He has yet to be resentenced.

Since his conviction in 1988 Cook has been confined to restricted housing, even after the vacation of his death sentence in 2003.  He is currently housed in SCI Graterford's RHU pursuant to a DOC policy, set forth in Section 802 of the DOC's Administrative Custody Procedures ("DC-ADM 802"), which mandates that capital prisoners awaiting sentencing must be housed in the RHU.  Every 90 days, pursuant to this policy, Cook's status as a RHU prisoner is reviewed by a Program Review Committee "allegedly so they can consider his adjustment to the RHU and a possible change in his status."  Cook characterizes these periodic administrative reviews as "perfunctory proceeding[s]" and states that "the extension of [his] solitary confinement is automatic."  According to Cook, "program reviews do not substantively review the prisoner's RHU assignment."  He states that he has requested a detailed explanation of the basis for his continued confinement in the RHU and that defendant Wenerowicz has denied this request on the basis that "it is 'Policy' to keep 'Pending Capitals' on death row in the RHU."

In his pleading, Cook describes the conditions to which he has been subjected as an RHU inmate.  During his 26

-4-

years in that status, Cook purports to have endured temperature
extremes inside the building "from sweltering and suffocating
summers to freezing and numbing winters."  He states that "there
is absolutely no air-conditioning or central heating directed
to" the wings of the prison in which the RHU is located.
Further, the RHU receives only minimal heating from radiators.
During the colder months, guards open the doors from the RHU to
the outside to let the freezing air in, explaining that doing so
"provides observation to the yard from the unit staff."  Porous
black mold grows on the ceiling in many parts of the RHU.
Residents live in cells which have no window to the outside.
One wall of each cell is made of metal bars and is open to the
area outside the cell, with the result that inmates are
subjected to constant loud noise.  Cook states that it is
impossible for him "to ever really get any 'sleep' in the true
sense of the word."  He also charges that the guards "manifest
an overt maliciousness by seizing every opportunity to wake-up
[sic] plaintiff whenever they see [him] sleeping."

        Cook also details the lack of privacy in the RHU.  His
cell, as noted above, has one wall made up of metal bars and
lacks any sort of privacy screen.  As a result, people outside
the cell can see him at all times, including his use of the
toilet.  He is permitted three showers a week, again in an area
which is exposed to those who walk by.  On several occasions,

outside visitors to the prison have passed by and seen Cook while he was showering.  Mold and mildew have grown on the walls and ceiling of the showers.

For a total of ten hours each week, Cook is permitted to exercise in one of the RHU's small outdoor "pens."  Several of these enclosures have accumulated bird droppings which, according to Cook, have "caused illness."  During inclement weather, inmates are not allowed to go outdoors at all.  Before he is permitted to leave or re-enter the RHU, Cook is subjected to a strip search, which he claims violates the restrictions of his Muslim faith.  Cook has filed several grievances, directed to a "Facility Grievance Coordinator," about the restrictions on the time he spends outdoors.

Cook is served all of his meals in his cell on trays which are frequently "filthy" and "dirty."  He often finds "clumps of food and particles from the previous days [sic] evening meal" on his breakfast tray.  The meals served in the RHU contain smaller portions and fewer calories than those served in general population, and are "often served cold when they are supposed to be hot."  In addition, according to Cook, the food is "rotten and barely edible."  On some occasions, Cook has chosen not to eat the food served to him.  He refused to accept a food tray from June 21, 2013 until at least September 18, 2013, instead sustaining himself on food from the

-6-

commissary.  Cook also alleges in his pleading that when the
prison provides special meals to inmates who have medical or
religious needs, those meals are often stolen by corrections
officers in the RHU.

Cook has filed numerous grievances and complaints
about the food, and has attached several of these grievances as
exhibits to his pleadings.  One of those grievances describes
Cook's refusal to accept a food tray from June 21, 2013 until at
least September 18, 2013 "because of the unsanitary conditions
of the food trays and the food not being properly cooked."  The
grievance further states that "several times" he has been "made
very ill after eating the food."  In response to another
grievance about the condition of the food trays, Cook received a
response that "[w]e will check on the cleanliness of the trays."
Dissatisfied with this resolution, he appealed to Wenerowicz,
who dismissed his appeal as untimely.

In March 2013, Cook made a request for Kosher meals as
a religious accommodation.  That request was denied by the DOC.
Cook submits as an exhibit to his pleading a memorandum from a
DOC official to a DOC Regional Deputy Secretary detailing that
denial.  It states that "[a] [K]osher diet is not mandated for
those who identify with the Nation of Islam faith."  The
memorandum suggests alternative ways for Cook to maintain his
preferred diet, such as requesting meals without animal

products.  Defendants Wetzel and Wenerowicz were copied on that memorandum, which bears the signature of a DOC Deputy Secretary.

Cook alleges that a number of the conditions to which he is exposed in the RHU differ significantly from those which exist in the prison's general population.  He states, for example, that prisoners in general population are permitted contact visits and "can hug and kiss their family and friends" and eat meals with their visitors while prisoners in the RHU are unable to do so.  Cook, however, concedes that he is allowed non-contact visits.  Those prisoners who reside in general population are entitled to two hot meals a day (out of three meals in total), unlike RHU prisoners.  General population residents also enjoy opportunities for indoor recreation, whereas RHU inmates are not able to exercise during inclement weather.  In general population, unlike in the RHU, strip searches when inmates leave their cell blocks or go outdoors are not routine.

Cook also pleads that the conditions to which he is subjected in the RHU have taken a toll on his mental and physical health.  He has been diagnosed with high blood pressure, hypertension, diabetes, vision impairment, and a condition known as "cognitive disconnect."  He also identifies physiological symptoms including anxiety, headaches, insomnia, nightmares, irrational anger, violent fantasies, and chronic

-8-

depression.   It is Cook's contention that these ailments are a
direct result of the RHU environment.

        Cook maintains he has been "consistently" denied
medical and dental care by SCI Graterford while an inmate in the
RHU.  As of the date his Amended Complaint was filed, he had not
seen a dentist or dental hygienist in more than four years,
notwithstanding his repeated requests.  Similarly, when
appointments are scheduled for Cook to see a doctor, they are
often cancelled because guards in the RHU "l[ie] to the Medical
Department telling them that [Cook] refused the appointment."
Cook receives no mental health treatment aside from annual
reviews conducted by mental health staff.  These reviews last
only a few minutes and involve a representative of the prison's
mental health department standing outside Cook's cell and
questioning him through the door, within earshot of other
inmates and staff.  Cook has asked to participate in group
therapy but has been informed that no such programs are
available.  Despite the multiple conditions described above from
which Cook suffers, he receives medication only for his high
blood pressure.  Cook characterizes this state of affairs as a
"pattern and practices [sic] of coercive denial of standard
medical care."  He claims that "[t]he denial of adequate medical
care at SCI-Graterford's RHU/death row is . . . a longstanding
and persistent pattern and practice which, on information and

-9-

belief, has been officially sanctioned by defendants for the purpose of coercing [Cook] to give-up [sic] his appeals and accept a LIFE sentence."

In his Amended Complaint, Cook states that defendants Corbett, Wetzel, and Wenerowicz each "caused, created, authorized, condoned, ratified, approved or knowingly acquiesced" in the conditions and policies of which he complains. These defendants, Cook states, are "deliberately indifferent" to the constitutional violations to which he has been subjected. He adds in his "Pro Se Supplement" that defendant Wolf "has the authority and responsibility to change and reverse" the policies and conditions authorized or acquiesced in by defendant Corbett and that Wolf is "knowingly or unknowingly indifferent to" the violations set forth by Cook. All four defendants, according to Cook, "directly and proximately" caused the injuries which he has suffered as a result of his continued confinement in the RHU. Cook also pleads that defendants are deliberately indifferent to the effects of the policies at issue and to the fact that he "continues to be harmed physically, mentally, intellectually and spiritually" do to his confinement in the RHU. Each defendant, Cook states, "ha[s] been and [is] aware of all the deprivations complained of" in Cook's pleadings, and each "ha[s] deliberately and knowingly caused such injury, pain and suffering."

In their motion to dismiss, defendants draw our attention to the publicly-available state court dockets for Cook's criminal proceedings.  Those dockets confirm that Cook was convicted and sentenced to death in 1988 in the Court of Common Pleas of Philadelphia County but that in 2003, that court vacated his death sentence after he filed a petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541-9546.  Cook immediately appealed the denial of his request for a new trial as to his guilt.[3]  The Pennsylvania Supreme Court rejected his appeal in 2008.  Since the date of the Pennsylvania Supreme Court's decision, Cook's resentencing has been repeatedly postponed.  It appears from the docket that the majority of continuances were initiated by Cook himself, while several delays involved the court's own scheduling.  It does not appear that any continuances or other delays were sought or caused by the Commonwealth.

III.

We first inquire whether the conditions complained of by Cook in Count One[4] amount to violations of his rights under the First, Eighth, or Fourteenth Amendments.  Cook states that

---

3.  The Commonwealth, for its part, appealed from the grant of a new penalty hearing but ultimately discontinued its appeal.

4.  Rather than listing counts, Cook's pleading lists a "First Cause of Action," "Second Cause of Action," and "Third Cause of Action."  We will construe and refer to these "Causes of Action" as "Count One," "Count Two," and "Count Three," respectively.

-11-

defendants engaged in violations of those rights, including constraints on certain religious needs and an "invasion of the sphere of his intellect and spirit."

We note at the outset that when a plaintiff alleges a violation of a specific constitutional right, we must address his claim in accordance with the terms of that specific provision rather than conducting a more general substantive due process analysis. Graham v. Connor, 490 U.S. 386, 394 (1989). Thus, to the extent that Cook alleges that certain conditions give rise to both violations of substantive due process and violations of specific constitutional rights, we must focus our analysis on the alleged violations of those more specific rights. See id.

The First Amendment claim contained in Count One is based in part upon the theory that defendants have violated "the First Amendment's protection Against State Action that Invades the Sphere of the Intellect and Spirit" by causing Cook's prolonged detention in the RHU and the alleged lack of adequate process through which to challenge his confinement. Cook points to no authority to support his theory, nor are we aware of any such authority. Insofar as Cook's First Amendment claim is premised on the theory that defendants have engaged in an "invasion of his intellect and spirit," it will be dismissed.

-12-

Cook also appears to plead certain infringements on his right to practice his Muslim faith.  Specifically, he alleges that he is "denied . . . religious services," that the DOC denied his "Request for Kosher Diet as Religious Accommodation," and that when entering or leaving the RHU he is subjected to a strip search which violates his religious restrictions.

To the extent that Cook's claim is premised on the strip searches to which he was subjected and on his lack of access to religious services, he has failed adequately to plead a First Amendment violation.  While prisoners retain certain First Amendment rights, these rights must be balanced against the prison's goals of deterrence and incapacitation and its interest in security.  Pell v. Procunier, 417 U.S. 817, 822-23 (1974); see also Turner v. Safley, 482 U.S. 78, 89 (1987).  We note also that the Supreme Court has made clear that strip searches are permissible in prisons as long as they are conducted in a reasonable manner.  Bell v. Wolfish, 441 U.S. 520, 559-60 (1979).  Officials at SCI Graterford have a legitimate penological interest in maintaining institutional security by conducting routine strip searches of inmates, particularly those violent offenders who have been convicted of capital murder.  Cook's pleading contains no indication that the searches were unreasonable.  The prison also has a legitimate

-13-

penological interest in restricting the access of RHU inmates to activities such as religious services where he would be mingling with other prisoners.  We will dismiss Cook's claims that the strip searches to which he was subjected and his lack of access to religious services violated his First Amendment rights.

In doing so, we note that as an inmate who has received a death sentence, Cook is entitled under Pennsylvania law to be visited by "[a] spiritual adviser selected by the inmate or the members of the immediate family of the inmate." 61 Pa. Cons. Stat. Ann. § 4303(3).  Cook does not aver that he has been denied access to such an adviser.

Cook's claim for relief based upon his denial of access to Kosher meals fares better.  Prisoners who seek specially-prepared meals as a result of beliefs which are "sincerely held" and "religious in nature" may be entitled to such an accommodation in the absence of legitimate penological concerns to the contrary.  See DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000) (quoting Africa v. Pa., 662 F.2d 1025, 1030 (3d Cir. 1981)).  In determining whether these conditions are met, a reviewing court must not "attempt to assess the truth or falsity of an announced article of faith," though it may determine whether a belief is "truly held."  Africa, 662 F.2d at 1030. Cook's pleading contains allegations sufficient to make out a First Amendment claim based upon the DOC's denial of his request

-14-

for special meals as a religious accommodation.  Though this is

enough to survive a motion to dismiss, we further note that

defendants have articulated no legitimate penological reason for

the denial of Cook's request for a Kosher meal.  See id.

Accordingly, Cook's First Amendment claim will survive

defendants' motion to dismiss insofar as it is based upon Cook's

lack of access to Kosher meals.

IV.

We next address whether Cook states a claim for relief

in Count Two of his amended complaint.  This Count alleges that

defendants violated Cook's Eighth Amendment right to be free

from cruel and unusual punishments by housing him in the RHU for

a prolonged period and by subjecting him to substandard living

conditions.

Cook has failed to allege an Eighth Amendment

violation based on his detention in the RHU.  In a case similar

to the one before us, our Court of Appeals held that the

confinement of a Pennsylvania inmate whose death sentence had

been vacated and who was housed in the RHU while awaiting

resentencing did not amount to cruel and unusual punishment.

Jones v. Sec'y Pa. Dep't of Corr., 549 F. App'x 108, 112 (3d

Cir. 2013).  The court ruled that an inmate had failed to state

a claim for relief under the Eighth Amendment simply because his

confinement in restricted housing continued following the

-15-

vacation of his death sentence.  Id.  This ruling governs our analysis here.  Further, we note again that many of the delays in Cook's resentencing and his possible removal from the RHU, particularly the more recent delays, have been caused by Cook himself.  While several appear to have been the result of the court's scheduling constraints, none appears to have been caused by the Commonwealth.  To the extent that Cook argues that his Eighth Amendment rights are violated by his confinement in the RHU, his claim will be dismissed.

Cook also bases his claims of cruel and unusual punishment on certain conditions of confinement to which he has been subjected while housed in the RHU.  As discussed above, the conditions of which Cook complains include food which is rotten, inedible, and served on filthy trays; denial of access to certain types of medical and dental care; temperature extremes; lack of privacy; a practice by some guards of maliciously waking inmates who are sleeping; lack of opportunities for recreation; lack of contact visits; and poor hygiene, including the presence of black mold.

Though "[t]he Constitution 'does not mandate comfortable prisons,'" the conditions to which inmates are exposed must be humane.  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981).  Accordingly, in barring the use of cruel and unusual

-16-

punishments, the Eighth Amendment prohibits prison officials from using excessive physical force and compels them to "ensure that inmates receive adequate food, clothing, shelter, and medical care" and that reasonable steps are taken to ensure the inmates' safety.  Id.

To establish that prison conditions amount to cruel and unusual punishment, a plaintiff must satisfy a two-part test consisting of objective and subjective components.  Farmer, 511 U.S. at 834.  The objective component requires a showing that the conditions to which the plaintiff has been subjected are "sufficiently serious," resulting in a denial of "the minimal civilized measure of life's necessities."  Id. (quoting Rhodes, 452 U.S. at 346).  In determining whether this objective component is satisfied, courts focus on whether the conditions contravene "the evolving standards of decency that mark the progress of a maturing society."  Id.  The subjective component, in turn, implicates the defendant's state of mind, requiring a plaintiff to show that the defendant was deliberately indifferent to his health or safety.  Id.  Courts are permitted to infer the existence of deliberate indifference "from the fact that the risk of harm is obvious."  Hope v. Pelzer, 536 U.S. 730, 738 (2002).

It is well established that "deliberate indifference to serious medical needs of prisoners" amounts to cruel and

-17-

unusual punishment in violation of the Eighth Amendment.
Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Our court of
appeals has noted that "even in less serious cases, where [a]
prisoner does not experience severe torment or a lingering
death, the infliction of unnecessary suffering is inconsistent
with standards of decency" for Eighth Amendment purposes.
Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).  If
"unnecessary and wanton infliction of pain results as a
consequence of denial or delay in the provision of adequate
medical care, the medical need is of the serious nature
contemplated by the [E]ighth [A]mendment."  Monmouth Cnty. Corr.
Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)
(internal citations and quotation marks omitted).

        A number of the conditions complained of by Cook do
not amount to a denial of "the minimal civilized measure of
life's necessities."  See Farmer, 511 U.S. at 834.  For example,
the reduced privacy in the RHU, the limited access to showers,
and the limited access to recreational opportunities and lack of
contact visits described by Cook do not give rise to Eighth
Amendment violations.  Nor does Cook state a claim under the
Eighth Amendment based on the presence of mold growth in the
RHU, as he does not state that this mold is pervasive or has
made him ill.  Cook likewise fails to state a claim based upon
the practice of RHU guards of rousing sleeping inmates.  It is

-18-

not uncommon for prison personnel to check on inmates throughout the night to ensure that they are still in their cells, and to the extent that Cook claims the guards wake him "maliciously," we find his contention implausible.  See Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

Cook's claims that the RHU lacked adequate heat in the winter and was without air conditioning in the summer likewise fail to give rise to an Eighth Amendment claim.  Cook points to no authority in support of his position to the contrary. Indeed, our Court of Appeals has questioned whether an inmate's exposure to freezing temperatures runs afoul of the Eighth Amendment, even when the inmate's cell "was so cold that it caused pain in his legs."  Burkholder v. Newton, 116 F. App'x 358, 363 (3d Cir. 2004).  Moreover, decisions of district courts within this district have further held that a lack of air conditioning does not give rise to an Eighth Amendment claim absent specific allegations about the harm a plaintiff suffered. See, e.g., Wenk v. N.J. State Dep't of Corr., No. 11-4430, 2011 WL 6002524, at *3 (D.N.J. Nov. 29, 2011); Davidson v. Masters, No. 89-3942, 1989 WL 58444, at *1 (E.D. Pa. May 31, 1989); Jones v. Zimmerman, No. 86-4135, 1986 WL 10785, at *1 (E.D. Pa. Oct. 1, 1986).  Further, Cook's complaint is again unspecific as to the length of time during which he was exposed to the cold or

heat and any harm he suffered as a result.  His allegations of inadequate heat do not give rise to an Eighth Amendment claim.

However, Cook does make out an Eighth Amendment claim on the basis that he was served rotten food on trays which were frequently dirty.  Allegations of substandard food in the prison setting can, under certain circumstances, give rise to a claim under the Eighth Amendment.  See, e.g., Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983); Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980); Reznickcheck v. Molyneaux, No. 13-1857, 2014 WL 133908, at *3 (E.D. Pa. Jan. 15, 2014); Brown v. Sobina, No. 08-128, 2009 WL 5173717, at *7 (W.D. Pa. Dec. 29, 2009).  In order to plead such a claim, a plaintiff must aver that he suffered a "discrete and palpable injury" as a result of the alleged deprivation.  Brown, 2009 WL 5173717, at *7; see also Robles, 725 F.2d at 15.  Cook has done so.  As noted above, he submits an exhibit to his pleading which makes clear that the problems with the food trays rendered him unable to accept a tray from June 21, 2013 until at least September 18, 2013, and that "[s]everal times" he was "made very ill" by the condition of the food.  What is more, Cook describes the problems with food service in his complaint in the present tense, which indicates that these issues are ongoing.  Cook's pleading is therefore sufficiently specific to state an Eighth Amendment claim based upon the condition of the food he receives and the

-20-

trays on which it is served.  See Reznickcheck, 2014 WL 133908, at *3.  We conclude that Cook's allegations relating to food service in the RHU state a claim under the Eighth Amendment.

Cook's allegations of inadequate medical and dental care also adequately plead cruel and unusual punishment in violation of the Eighth Amendment.  Cook describes being denied dental care and other health care, as well as medications for a number of his ailments.  He also states that he receives almost no mental health services despite suffering from myriad psychological conditions which he claims were exacerbated by his confinement in the RHU.  Cook's health care needs, and in particular his psychological problems, amount to "serious medical needs."  See Estelle, 429 U.S. at 104.  As noted above, Cook pleads that defendants were deliberately indifferent to these needs.  See id.  Even if he had not adequately pleaded such indifference, we would infer it here because "the risk of harm [was] obvious."  See Hope, 536 U.S. at 738.  His claims of inadequate medical and dental care therefore establish an Eighth Amendment claim.

In sum, Cook's claims in Count Two will be dismissed insofar as they are premised simply on his detention in the RHU. They will also be dismissed insofar as they are premised on lack of privacy in the RHU, limited access to showers and recreational opportunities, lack of contact visits, the presence

of mold, the alleged efforts of guards to wake sleeping inmates,
and the temperature extremes.  Insofar as the claims in Count
Two are based upon Cook's allegations of lack of medical and
dental care and on the allegedly substandard food and conditions
of meal service, however, they will be permitted to go forward.

V.

Cook avers in Count Three that he has been denied due
process in violation of the Fourteenth Amendment.  He argues
that he has a liberty interest in being housed outside of the
RHU and that he has been deprived of this interest without
adequate process.  Specifically, he states that defendants have
"den[ied] him meaningful and timely periodic review of his
continued long-term and indefinite detention at the SCI-
Graterford RHU/death row and meaningful notice of what he must
do to gain release."  Though Cook does not specify whether he
pleads procedural due process violations or substantive due
process violations, the details of his allegations lead us to
conclude that they implicate procedural due process.

Defendants draw our attention to the decision of the
Commonwealth Court of Pennsylvania in Clark v. Beard, 918 A.2d
155 (Pa. Commw. Ct. 2007).  In that case Cook, as well as six
other inmates whose death sentences had been vacated and who
were housed in the RHU while awaiting resentencing, challenged
their detention on procedural due process grounds.  The

-22-

Commonwealth Court held that the Clark plaintiffs' claim had been properly dismissed because those plaintiffs had not established a liberty interest in being housed outside the RHU. Id. at 164.  In doing so, the court noted that "principles of due process impose few restrictions on" the authority of prison officials to determine where to house a prisoner.  Id. at 161. Further, the plaintiffs in Clark had failed to allege "any baseline against which to measure" the conditions complained of in order to "determine whether they pose an atypical and significant hardship."  Id. at 162-63 (internal citation omitted).  Absent allegations of such a baseline, the Clark plaintiffs had failed to establish that they had a liberty interest in being moved to the general population.

Cook, in turn, urges that this matter is on all fours with the Supreme Court's ruling in Wilkinson v. Austin, 545 U.S. 209 (2005).  In Wilkinson, the Court concluded that the plaintiffs had established a liberty interest in being free from the restrictive confinement conditions imposed at the Ohio State Penitentiary ("OSP"), a Supermax facility, by showing that those conditions imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 223.  The Court reached that conclusion, however, in part because the plaintiffs had shown that residents of the OSP,

-23-

unlike residents not confined to the OSP, were ineligible for parole consideration.  Id. at 224.

Cook, in his pleading, has described in detail the contrast between the conditions to which he is subjected in the RHU and the conditions which he would enjoy as an inmate in general population.  By doing so, he has established a "baseline against which to measure" the conditions he describes.  See Clark, 918 A.2d at 162; see also Wilkinson, 545 U.S. at 223. However, Cook falls short in that these conditions do not impose an "atypical and significant hardship" as compared to the conditions in general population.  See Wilkinson, 545 U.S. at 223 (citing Sandin v. Conner, 515 U.S. 472, 484 (1995)). Notably, unlike the plaintiffs in Wilkinson, Cook has not alleged that being housed outside of the RHU would make him eligible for parole.  See id. at 224.  He has therefore failed to aver a liberty interest in being transferred to the general population.

Even if we were to conclude that Cook had established a liberty interest, he has not shown that he was deprived of that interest without adequate process.  First, as noted above, Cook's status is assessed every 90 days through periodic reviews, though he argues that these reviews are cursory.  More importantly, Cook's situation is distinguishable from that of Wilkinson in that his assignment to the RHU is not a matter of

-24-

discretion.  See id. at 215-17.  Defendants note – and Cook has

acknowledged – that the Pennsylvania prison system assigns

inmates whose death sentences have been vacated and who are

awaiting resentencing to the RHU pursuant to DC-ADM 802, a DOC

administrative regulation.  Defendants observe that this policy

is consistent with a Pennsylvania statute which provides:

> Upon receipt of the warrant [issued by the
> Governor and specifying a date of
> execution], the secretary [of corrections]
> shall, until infliction of the death penalty
> or until lawful discharge from custody, keep
> the inmate in solitary confinement.  During
> the confinement, no person shall be allowed
> to have access to the inmate without an
> order of the sentencing court, except the
> following:
>
> (1)  The staff of the department.
>
> (2)  The inmate's counsel of record or other
>      attorney requested by the inmate.
>
> (3)  A spiritual adviser selected by the
>      inmate or the members of the immediate
>      family of the inmate.

61 Pa. Cons. Stat. Ann. § 4303.[5]  The criminal proceedings

against Cook provided him adequate opportunity to challenge his

---

5.  This statute, which took effect in 2009, uses language which
is identical in all relevant respects to that of a now-repealed
earlier statute, 61 Pa. Stat. Ann. § 3003.  Neither party has
indicated whether, in Cook's case, a warrant has been received
by the Secretary of Corrections as contemplated by the statute.
However, both the Commonwealth Court and our Court of Appeals
have interpreted § 4303 and its predecessor, § 3003, to apply to
situations like Cook's.  Jones, 549 F. App'x at 111-12; Clark,
918 A.2d at 160.  Accordingly, we will do the same.

death sentence, which mandated his placement in the RHU pursuant to statute and administrative regulation.

Moreover, defendants draw our attention to the public record of Cook's resentencing proceedings in Pennsylvania state courts.  We reiterate that the record makes clear that Cook's protracted wait for resentencing – and, by extension, for the possibility of removal from the RHU – is in large part the result of delays and continuances sought by Cook himself. Following the Pennsylvania Supreme Court's 2008 ruling on Cook's appeal of the outcome of his PCRA petition, the public docket includes numerous entries demonstrating that continuances were granted for reasons such as "Defense request.  Still preparing mitigation report to give to counsel" and "Defense request for further penalty phase investigation."  In reviewing the dockets, we have been able to identify no instances in which the Commonwealth sought a delay or continuance.  Cook cannot obtain relief as a result of delays which are of his own making.

Defendants further argue that Cook's procedural due process claim is barred by the doctrines of issue and claim preclusion, since any due process issues were adjudicated by the Commonwealth Court of Pennsylvania in <u>Clark</u>.  We need not reach the merits of this argument, as we have already concluded that Cook has failed to establish that his confinement in the RHU gives rise to a Fourteenth Amendment violation.

-26-

As noted above, it does not appear from Cook's pleading that he seeks relief on substantive due process grounds.  To the extent that he alleges that certain of his constitutional rights have been violated, he rests his claims on First and Eighth Amendment grounds.  Even if Cook does mean to argue that the conduct at issue gives rise to substantive due process claims, however, we cannot consider those claims. Graham compels us to address Cook's claims in accordance with the terms of specific constitutional provisions instead of conducting a general substantive due process analysis.  490 U.S. at 394.

Accordingly, we will dismiss the due process claims articulated in Count Three.

VI.

Cook's claims for relief are based on 42 U.S.C. § 1983.  That statute provides a remedy for deprivations of constitutional or other federal rights, but does not create substantive rights on its own.[6]  Kneipp v. Tedder, 95 F.3d 1199,

---

6.  In relevant part, § 1983 provides:

> Every person who, under color of any
> statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or
> causes to be subjected, any citizen of the
> United States or other person within the
> jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities
> secured by the Constitution and laws, shall

1204 (3d Cir. 1996).  A plaintiff seeking relief under § 1983 must demonstrate that he or she has been subjected to such a deprivation and that the deprivation was committed by a person who acted under color of state law.  Id. (internal citations omitted).  Having determined which of the conditions alleged by Cook amount to constitutional deprivations, we may now assess whether he has stated a claim for damages or for equitable relief against the named defendants pursuant to § 1983.

Under § 1983, state officials are liable for damages only when sued in their individual, or personal, capacities. Hafer v. Melo, 502 U.S. 21, 31 (1991); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  When sued in their official capacities, however, state officials may be subject to prospective injunctive relief but not liability for monetary damages under § 1983.  Will, 491 U.S. at 71 n.10; Iles v. de Jongh, 638 F.3d 169, 177-78 (3d Cir. 2011).

In order to proceed with a civil rights action brought pursuant to § 1983, a plaintiff must plead that the defendant was personally involved in the constitutional violation at issue.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  State actors are liable under § 1983 for the unconstitutional acts of their subordinates only in two discrete

------

be liable to the party injured in an action
at law, suit in equity, or other proper
proceeding for redress.

contexts.  First, "a supervisor may be personally liable under
§ 1983 if he or she participated in violating the plaintiff's
rights, directed others to violate them, or as the person in
charge, had knowledge of and acquiesced" in the violations.  Id.
(citing A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.,
372 F.3d 572, 586 (3d Cir. 2004)).  Second, a supervisor-defendant
may be held liable "if it is shown that such defendant[], 'with
deliberate indifference to the consequences, established and
maintained a policy, practice or custom which directly caused [the]
constitutional harm.'"  Id. (citing A.M. ex rel. J.M.K., 372 F.3d
at 586).

        As noted above, Cook has sued former Governor Corbett,
as well as Wetzel and Wenerowicz, in their individual and official
capacities.  He pleads that each of those three defendants "caused,
created, authorized, condoned, ratified, approved or knowingly
acquiesced in" the conditions of which Cook complains and the
policies giving rise to those conditions.  As to Governor Wolf,
Cook sues him in his official capacity only.  He further pleads
that the Governor has the authority to modify the "policies,
customs and practices" in which Corbett "knowingly acquiesced."
Cook also avers that the Governor "has been and continues to be
knowingly or unknowingly indifferent to the injuries" described in
the complaint.

Cook's contention of personal involvement is not "plausible on its face" insofar as it applies to former Governor Corbett and Governor Wolf.  See Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  We find it implausible, without more, that the former or current Chief Executive of the Commonwealth would have known of or had personal involvement with Cook, a specific inmate at SCI Graterford, who was allegedly being denied certain religious accommodations, served substandard meals, or subjected to the other conditions which may serve as a basis for Cook's First and Eighth Amendment claims.  Moreover, any claim by Cook seeking injunctive relief against former Governor Corbett is moot as the latter left office in January 2015.  Accordingly, we will dismiss Cook's amended complaint insofar as it alleges § 1983 liability against former Governor Corbett and Governor Wolf.

We must now determine whether the facts alleged by Cook, insofar as they amount to violations of the Constitution or other federal law, give rise to § 1983 liability for damages or for prospective injunctive relief against Wetzel and Wenerowicz.  Cook has sufficiently alleged that he was subjected to certain constitutional deprivations.  He also pleads generally that Wetzel and Wenerowicz, acting in supervisory roles, knew of and acquiesced in these deprivations, and that

-30-

the conditions at issue amounted to "policies" and "customs."
See Rode, 845 F.2d at 1207.

Cook provides more specific allegations of the
involvement of Wetzel and Wenerowicz in the DOC's denial of
Cook's request for a Kosher meal.  As noted above, he attaches
to his pleading a memorandum detailing that denial that was
approved by a DOC Deputy Secretary and copied Wetzel and
Wenerowicz.  The memorandum demonstrates that the officials
maintained a policy of denying Kosher meals to adherents of the
Nation of Islam faith.  As to Cook's First Amendment claim based
on his lack of access to Kosher meals, Cook has sufficiently
alleged the personal involvement of Wetzel and Wenerowicz
pursuant to § 1983.  See Rode, 845 F.2d at 1207.

We also find plausible Cook's contention that
Wenerowicz, as the prison superintendent, was personally
involved in the severely limited medical and dental care
provided to RHU inmates.  See Iqbal, 556 U.S. at 678 (quoting
Twombly, 550 U.S. at 570).  It is plausible that the
superintendent of a prison would play a role in the
administration of medical and dental services in that facility
and that he would have some control over the extent to which
those services were made available.  It is also plausible that
the superintendent would have some involvement in the provision
of adequate food to inmates.  We do not find it plausible,

-31-

however, that Wetzel, as the Secretary of the Department of
Corrections, had personal involvement in any denial of medical
and dental care to Cook or other RHU inmates at SCI Graterford
or in any food service problems in that prison.

Accordingly, Cook has not stated a claim for damages
or for prospective injunctive relief under § 1983 against either
Governor Wolf or former Governor Corbett.  He has stated a claim
under § 1983 for damages against Wetzel and Wenerowicz in their
individual capacities based upon his lack of access to a Kosher
diet and against Wenerowicz alone in his individual capacity
based upon SCI Graterford's denial of access to medical and
dental care and its provision of allegedly substandard food.
See Hafer, 502 U.S. at 31; Will, 491 U.S. at 71.  Cook also has
a viable claim for prospective injunctive relief against them in
their official capacities.  See Will, 491 U.S. at 71 n.10; Iles,
638 F.3d at 177-78.  As to all of the other constitutional
deprivations alleged by Cook, he has failed adequately to plead
a § 1983 claim for damages or for prospective injunctive relief.

VII.

Defendants argue that they are shielded from liability
for damages by the defense of qualified immunity.  That doctrine
"protects government officials 'from liability for civil damages
insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person

-32-

would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231
(2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).
Its primary purpose is to "ensure that '"insubstantial claims"
against government officials [will] be resolved prior to
discovery.'"  Id. (quoting Anderson v. Creighton, 483 U.S. 635,
640 n.2 (1987)) (alteration in original).  In determining
whether the defense of qualified immunity is applicable, a court
must conduct a two-pronged analysis, determining both whether a
plaintiff has pleaded a constitutional violation and whether the
constitutional right at issue was "clearly established" at the
time of the alleged misconduct.  Id. at 232.  Unless the answer
to both questions is "yes," the official is entitled to
qualified immunity.  See id.  Courts are "permitted to exercise
their sound discretion in deciding which of the two prongs of
the qualified immunity analysis should be addressed first in
light of the circumstances in the particular case at hand."  Id.
at 236.

        While defendants state generally that "[q]ualified
immunity . . . bars the federal claims for damages against
them," the gravamen of their argument is that they are entitled
to qualified immunity from being sued for confining Cook in the
RHU for a prolonged period following the vacation of his death
sentence.  We have already determined that Cook has no
constitutional right to be free from prolonged RHU confinement

-33-

pending resentencing.  Because no constitutional right is at issue, the conduct of defendants in detaining Cook did not "violate[] a clearly established constitutional right," and therefore "[q]ualified immunity is applicable" as to the claims based on that conduct.  See Pearson, 555 U.S. at 816.

Aside from their statement that they should be entitled to qualified immunity on "the federal claims for damages," defendants do not appear to argue that qualified immunity bars Cook's First Amendment claims or those Eighth Amendment claims which are based on the conditions of his confinement.  They provide no analysis or citation of authority to show that the conduct which serves as the basis for those claims did not "violate[] a clearly established constitutional right."  See Pearson, 555 U.S. at 816.  We are mindful that "the burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff."  Thomas v. Independence Twp., 463 F.3d 285, 293 (3d Cir. 2006).  Defendants have not met this burden.  We will therefore decline to grant them qualified immunity from Cook's remaining First Amendment and Eighth Amendment claims.

## VIII.

Defendants also contend that Cook has failed to establish an entitlement to punitive damages, arguing that no such damages are available in light of the DOC administrative

-34-

policy which governs Cook's confinement.  We have concluded that Cook has not made out a constitutional violation based on his confinement in the RHU alone.  Therefore, we need not address whether Cook is entitled to punitive damages as a result of that confinement.

Defendants present no argument that Cook is not entitled to punitive damages for his remaining claims, that is, his claims based on the denial of his request for Kosher meals and on his lack of access to medical and dental care. Accordingly, we will permit Cook to go forward in seeking punitive damages based on those claims.