IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT L. COOK, JR.            :              CIVIL ACTION
                               :
          v.                   :
                               :
TOM CORBETT, et al.            :              NO. 14-5895

MEMORANDUM

Bartle, J.                                    April 26, 2016

        Plaintiff Robert L. Cook, Jr. ("Cook"), an inmate at
Pennsylvania's State Correctional Institution at Graterford
("SCI Graterford"), has sued Pennsylvania Department of
Corrections ("DOC") Secretary John Wetzel ("Wetzel") and Michael
Wenerowicz ("Wenerowicz"), who was at all relevant times the
Superintendent of SCI Graterford.[1]  Cook alleges violations of
the First and Eighth Amendments to the United States
Constitution under 42 U.S.C. § 1983.  He seeks declaratory and
injunctive relief as well as punitive damages.

        On July 8, 2015, we dismissed Cook's claims against
two additional defendants, Pennsylvania Governor Tom Wolf and
former Pennsylvania Governor Tom Corbett.  We also dismissed
Count One[2] of Cook's amended complaint, which alleged violations

---

1.  Wenerowicz is now the Acting Regional Deputy Secretary of
the DOC.  Cynthia Link has replaced him as Superintendent of SCI
Graterford.

2.  Rather than listing counts, Cook's pleading lists a "First
Cause of Action," "Second Cause of Action," and "Third Cause of
Action."  We construe and refer to these "Causes of Action" as
"Count One," "Count Two," and "Count Three," respectively.

of the First, Eighth, and Fourteenth Amendments,[3] except insofar
as it pleaded a claim for damages against Wetzel and Wenerowicz
in their individual capacities and for prospective injunctive
relief against them in their official capacities pursuant to the
First Amendment based on the denial of Cook's request for Kosher
meals.  In addition, we dismissed in part Count Two, which
alleged violations of Cook's Eighth and Fourteenth Amendment
rights.  We permitted that count to proceed on Cook's claim for
damages from Wenerowicz in his individual capacity and
prospective injunctive relief against him in his official
capacity based on Cook's alleged lack of access to adequate
medical, dental, and mental health care and on the allegedly
substandard food and conditions of meal service to which he had
been exposed.  Finally, we dismissed in its entirety Count
Three, which alleged that Cook's Fourteenth Amendment rights had
been violated by his prolonged confinement in the restrictive
housing unit ("RHU") at SCI Graterford.

Now before the court is the motion of Wenerowicz and
Wetzel for summary judgment.  On January 22, 2016, Cook, who is
proceeding pro se, requested an extension of time to respond to

---

3.  We note that the rights guaranteed by the First and Eighth
Amendments exist through incorporation via the Due Process
Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV,
§ 1.

the motion.  The court granted him until February 23, 2016.
That deadline has long passed without any response from Cook.

I.

Summary judgment is appropriate "if the movant shows
that there is no genuine issue as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).[4]  A dispute is genuine if the evidence is such that a
reasonable factfinder could return a verdict for the nonmoving
party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).
Summary judgment is granted where there is insufficient record
evidence for a reasonable factfinder to find for the nonmovant.
Id. at 252.  "The mere existence of a scintilla of evidence in
support of the [nonmoving party]'s position will be insufficient;

---

2.  Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion
> by . . . citing to particular parts of
> materials in the record, including
> depositions, documents, electronically stored
> information, affidavits or declarations,
> stipulations . . . , admissions, interrogatory
> answers, or other materials; or . . . showing
> that the materials cited do not establish the
> absence or presence of a genuine dispute, or
> that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

-3-

there must be evidence on which the jury could reasonably find" for that party.  Id.

Summary judgment is not appropriate, however, merely because there is no genuine issue of material fact.  Instead, in ruling on a motion for summary judgment we must also ask whether "one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  Thus, a motion to which no response has been filed will not automatically be granted as unopposed.  Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990).  While the facts asserted by the movant may be considered undisputed for the purposes of that movant's summary judgment motion, the movant must also be entitled to judgment as a matter of law.  Id.

When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the facts and draw all inferences in favor of the nonmoving party. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

A party asserting that a particular fact "cannot be or is genuinely disputed" must support its assertion by "citing to particular parts of materials in the record" or by "showing that

-4-

the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).

II.

The following facts are undisputed.

Cook is an inmate housed in the Capital Case wing of the J Block, an RHU at SCI Graterford.  In 1998 he received a death sentence which was vacated in 2003.  He has yet to be resentenced and thus remains in the Capital Case wing.

As an RHU inmate, Cook receives medical care, including dental care and mental health evaluations, on a regular basis.  Nurses come into the Capital Case wing twice a day.  Inmates needing medical assistance can submit "sick call slips" in order to summon a medical assistant or a doctor's assistant.  In the past year, Cook has been seen by the medical staff "[t]oo much to recall" as a result of having submitted such requests.  In 2015, he received a physical examination from "a doctor in the medical department."  He also receives two medications on a regular basis, both of which "relate to hypertension and blood pressure."

Cook also has access to dental care but has refused it on several occasions. In 2013 and in 2015, Cook declined to be seen by a dentist because he did not want to be restrained while in the dentist's chair. In his deposition, he explained: "I have a fear and anxiety that's elevated when I'm in the chair, and operating on my mouth with sharp instruments." Because of the high security risk posed by Capital Case Unit inmates, it is RHU policy for them to be restrained while they receive dental care.

Cook may ask for mental health services at any time by submitting a request slip. Every few weeks at a minimum, a psychologist visits the wing on which Cook is housed. It is SCI Graterford's policy to ensure that each inmate is seen by a mental health care professional at least once a month.[5] The mental health staff at SCI Graterford has concluded that Cook "is not suffering from any mental health problems or serious mental illness." He is not currently being medicated or otherwise treated for any such issues.

Three times a day Cook receives a meal which is served on a tray and passed to him through an aperture in the door of his cell. He can also spend up to $65 per month at the

---

5. Cook was able to cite two specific occasions during 2015 on which he met with a mental health professional.

commissary, which offers snacks and other food items like Ramen noodles and canned fish.

Cook has complained that the trays on which his meals are served are frequently dirty. There is "[s]ometimes . . . food from previous meals on the tray," particularly at breakfast, and "there literally would be oatmeal running down the sides of the trays some mornings." Wenerowicz has visited the Capital Case Unit during meal times and has checked the meal trays in order to observe the quality of the food. He states in an affidavit that he "never observed dirty trays or anything that did not comply with DOC standards for food service." On a few occasions, Cook has been served meals without the fresh fruit and juice that he believes he is entitled to receive. On other occasions, his meals have failed to meet his expectations in that there are "literally, several slithers [sic] of lettuce on a tray, and not an adequate portion of salad," "there are only a few peas on the tray," or a slice of pizza has been "cut off" in order to fit into one of the "slots" on the tray.

Cook is a member of the Nation of Islam and identifies himself as a follower of the teachings of Elijah Muhammad. The dietary restrictions imposed on him by his faith are set forth in a book by Elijah Muhammad entitled How to Eat to Live. In accordance with these teachings, Cook fasts during the day and only eats in the evening. He accomplishes this in part by

-7-

saving from breakfast and lunch the food which he believes complies with his dietary restrictions and using this food to supplement his evening meal.  Because he eats only once per day, Cook generally does not accept the breakfast tray that is brought to his cell.  If he does accept it, he simply removes the sugar packet or the bread and gives the tray back to the guard.  He also accepts the fresh fruit and juice that is sometimes served with breakfast.  Cook often purchases items from the commissary so as to supplement his diet with some items and to trade others to his fellow inmates in exchange for fruit.

Cook avoids certain foods which in his view are prohibited or discouraged by his faith.  For example, he does not eat food which he considers to be "processed," meaning that it contains "[c]hemical artificial coloring and man-made chemical preservatives."  This includes the "poultry patties" that are frequently served in the RHU.  He does not eat soy products, pork products, chips, cookies, peanut butter, skim milk, or low-fat cottage cheese.  The foods Cook does eat include fresh vegetables, fresh fruit, juice, jelly, bread, bagels, oatmeal, canned fish, an item sold in the commissary called "summer sausage," Ramen noodles without the flavoring added, pizza, and bean salad.

In March 2013, Cook requested a Kosher diet as a religious accommodation.  He did so based on a passage in How to

-8-

Eat to Live which urges members of the Nation of Islam to satisfy their dietary obligations by seeking out Kosher food. During his deposition Cook read from the relevant sections of How to Eat to Live:  "It says, quote, if you would like to find good food, such as lamb, beef, or even chicken, if you're a Muslim, but it's from the strictly Orthodox Jew.  Be certain it is an Orthodox Kosher market . . . Orthodox Jews are excellent in protecting their health."  He interprets this to mean that "the way [Orthodox Jews] fix their food and prepare their food is the same as Muslims should."  Cook also stated that he had been "instructed that the Kosher meals meet the restricted diet of the Nation of Islam."

The Kosher diet that is served at SCI Graterford consists of:  a breakfast of fresh fruit, cold cereal, bread, peanut butter, jelly, and milk; a lunch of raw vegetables, fresh fruit, bread, graham crackers, marinated bean salad or peanut butter, jelly, and a beverage; and a dinner of raw vegetables, fresh fruit, bread, graham crackers, marinated bean salad or cottage cheese, jelly, and a beverage.  The marinated bean salad served as part of the Kosher diet contains soy products, while the breakfast cereal contains additives that would be considered "processed" according to Cook's interpretation of the term.

In addition to the Kosher diet, two additional "religious diets" are available to qualifying SCI Graterford

inmates.  The "alternative protein source entrée" diet "does not
contain animal flesh or any animal by-products."  The "no animal
products" diet consists only of items which are "free from all
animal flesh and any animal-derived food sources or
by-products."  There is no indication in the record that SCI
Graterford offers a diet tailored to members of the Nation of
Islam.  However, every December, inmates who are part of the
Nation of Islam have the option of being served specialty meals
for the entire month as part of a "December fast."[6]  During that
month, Cook receives a single daily meal that is sufficient to
sustain him for the entire day.

While Cook does not say that all Kosher food meets his
dietary restrictions, he maintains, "My thing is that the
closest they have to meet my requirements [is] a Kosher meal."
As to the possibility that a Kosher meal might contain items
that he could not eat, he has explained:  "If I find something
in there that does not meet my dietary restrictions, I can go
without that."  He stated that soy products were one such
example.

Cook's request for a Kosher diet as a religious
accommodation was denied by the DOC in April 2013.  The
notification of the denial identified Cook's religion as "Nation

---

6.  In his deposition Cook clarified that this "December fast"
and the feast that is celebrated at its conclusion are not the
same as Ramadan or Eid.

of Islam."  In the notification, a DOC Deputy Secretary
explained that "[a] [K]osher diet is not mandated for those who
identify with the Nation of Islam faith."  The Deputy Secretary
went on to suggest that Cook "maintain a diet void [sic] of
meat" by requesting an alternative protein menu option or a "No
Animal Products" diet.  The Deputy Secretary added that Cook
could reapply for a Kosher diet after one year, "provided he is
able to more clearly demonstrate the sincerity of his faith."
Wetzel and Wenerowicz were copied on the notification.
Wenerowicz does not recall having seen it.

                            III.

          We first address whether Wetzel and Wenerowicz are
entitled to summary judgment on Cook's claim that the denial of
his request for a Kosher diet violated his First Amendment
rights.

          While prisoners retain certain First Amendment rights,
these rights must be balanced against the prison's goals of
deterrence and incapacitation and its interest in security.
Pell v. Procunier, 417 U.S. 817, 822-23 (1974); see also Turner
v. Safley, 482 U.S. 78, 89 (1987).  A prisoner asserting that
his constitutional interests are impinged upon by the denial of
his request for specially-prepared meals must first demonstrate
"that a constitutionally protected interest is at stake."
DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000).  In order to do

                            -11-

so, he must show that the religious beliefs that serve as the basis for his request are both "sincerely held" and "religious in nature." Id. at 51-52 (quoting Africa v. Pennsylvania, 662 F.2d 1025, 1030 (3d Cir. 1981)). In determining whether these conditions are met, a reviewing court must not "attempt to assess the truth or falsity of an announced article of faith," though it may determine whether a belief is "truly held." Africa, 662 F.2d at 1030.

It is undisputed, as noted above, that Cook requested a Kosher meal as a religious accommodation. Significantly, in denying Cook's request, a DOC Deputy Secretary stated that he was doing so not for penological reasons but because of DOC's apparent theological view that Cook did not require a Kosher meal as a member of the Nationl of Islam. The notification of the denial acknowledged Cook's Nation of Islam faith but instructed that he could reapply for a Kosher diet after one year "provided he is able to more clearly demonstrate the sincerity of his faith." Wetzel and Wenerowicz now acknowledge, however, that Cook's beliefs are "sincerely held" and "religious in nature." See DeHart, 227 F.3d at 51-52.

There is evidence in the record that Cook's First Amendment rights are implicated by the denial of his dietary request. Thus, the court must determine whether that denial is "reasonably related to legitimate penological interests."

-12-

Turner, 482 U.S. at 89.  We first inquire whether there is a
"valid, rational connection between the prison regulation and
the legitimate interest put forth to justify it."  Fontroy v.
Beard, 559 F.3d 173, 177 (3d Cir. 2009) (quoting Monroe v.
Beard, 536 F.3d 198, 207 (3d Cir. 2008)).  The prison bears the
burden of demonstrating the existence of this connection, but we
must "afford 'substantial deference' to [its] professional
judgment."  Id.  If a "valid, rational connection" is
established, we consider three additional factors:  "1) whether
inmates have an alternative means of exercising the right;
2) the burden on prison resources that would be imposed by
accommodating the right; and 3) whether there are alternatives
to the regulation that fully accommodate the inmate's rights at
de minimis cost to valid penological objectives."  Fontroy, 559
F.3d at 178.  Prisons are not obligated to use the least
restrictive means in furtherance of legitimate penological
objectives.  Id.

        Since there is no disagreement that a
constitutionally-protected interest is at stake, we must
determine whether there is undisputed evidence that the denial
of Cook's request for a Kosher diet was "reasonably related to
legitimate penological interests."  Id.; Turner, 482 U.S. at 89.
In addition to the initial explanation that Cook was not
entitled to a Kosher meal because it was "not mandated" by his

-13-

faith, defendants have now articulated three penological
interests in support of their challenge to Cook's First
Amendment claim.  First, they state that there is an interest in
providing Cook a nutritionally adequate diet and argue that this
interest would be compromised by Cook's inability to eat some of
the items in the Kosher meals.  Second, they argue that access
to the Kosher menu would give Cook added opportunities to barter
with other inmates, which "gives one inmate control over another
and poses a security risk."  Finally, defendants urge that the
prison has an interest in keeping its food service program
simple and avoiding the appearance that one inmate is receiving
special treatment.  Defendants contend that these justifications
are legitimate and that they have a "valid, rational connection"
to the prison's denial of Cook's request.  See Fontroy, 559 F.3d
at 177 (citation omitted).

        We disagree with defendants' claim that there is an
adequate connection between the interests they articulate and
the decision by SCI Graterford officials to deny Cook's request
for a Kosher diet.  See id.  While allowing Cook to receive
Kosher meals might result in his consuming a nutritionally
inadequate diet, this would be no different from the current
state of affairs.  It is undisputed that Cook presently rejects
menu items that are at odds with his religious requirements.
There is no evidence that denying Cook's request somehow

increases the chances that he will consume all of the food that is served to him.  Similarly, there is no evidence that Cook would have added opportunities to barter with his fellow inmates if he were to receive Kosher meals.  Again, it is undisputed that Cook already engages in such trading with meal items and food he purchases from the commissary.  As to defendants' third justification, we see no reason why the simplicity of the food service program would be compromised by his request.  It is undisputed that SCI Graterford makes Kosher meals available to other inmates.  For the same reason, granting Cook's request would not give rise to the appearance that one inmate was receiving special treatment.  While we recognize that the judgment of prison officials is entitled to substantial deference, the determination at issue was not justified by the reasons articulated by defendants.  See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987).

Having concluded that there is no "valid, rational connection" between the denial of Cook's request for a Kosher meal and the interests presented to justify it, we need not reach the remaining three Turner factors.  See Fontroy, 559 F.3d at 177 (citation omitted).  We note, however, that these factors cut against defendants' request for summary judgment on Cook's First Amendment claim.  Cook has no alternative means of exercising his right to eat a diet that satisfies his religious

obligations, because none of the diets offered at SCI Graterford fully meet his needs.  See id. at 178.  Any burden on prison resources by granting his request would be minimal, since SCI Graterford already serves Kosher meals to some inmates.  See id. Finally, defendants point to no evidence that "alternatives exist that fully accommodate [Cook]'s right at *de minimis* cost to valid penological objectives."  See id.

Wetzel and Wenerowicz further urge that they are entitled to summary judgment on Cook's First Amendment claim insofar as it seeks damages because they lack the requisite personal involvement to be liable under § 1983.[7]  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  We disagree. An official's personal involvement in an alleged constitutional violation can be shown "through allegations of personal direction or of actual knowledge and acquiescence."  Id.  At the very least, there remain genuine issues of material fact as to whether Wetzel

---

7.  In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

and Wenerowicz actually knew of and acquiesced in the decision to deny Cook's request for a Kosher diet.

We also reject the contention of Wetzel and Wenerowicz that they are entitled to qualified immunity on Cook's First Amendment claim.  The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In determining whether the defense of qualified immunity is applicable, a court must conduct a two-pronged analysis.  It must decide whether a plaintiff has pleaded a constitutional violation and whether the constitutional right at issue was "clearly established" at the time of the alleged misconduct.  Id. at 232.  Unless the answer to both questions is "yes," the official is entitled to qualified immunity.  See id.  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id. at 236.

We have previously determined that Cook has pleaded a constitutional violation.  See Memorandum and Order dated July 8, 2015 (Docs. ## 39 & 40).  Indeed, as noted above, it is our

-17-

determination that defendants are not entitled to summary judgment on the issue of whether such a violation occurred.  We now conclude that the constitutional right at issue, that is Cook's right to receive a diet that reasonably accommodated his religious needs, was clearly established when Cook's request was denied in April 2013.  See, e.g., DeHart, 227 F.3d at 51. Contrary to defendants' assertions, it would not be "new law" to permit Cook to receive a Kosher diet.

In any event, the doctrine of qualified immunity pertains only to claims for civil damages.  See Harlow, 457 U.S. at 818.  Even if we were to conclude that Wetzel and Wenerowicz were entitled to qualified immunity on Cook's First Amendment claim, his request for prospective injunctive relief as to that claim could proceed.

IV.

We next turn to whether Wenerowicz is entitled to summary judgment on Cook's allegation that he has been denied adequate medical care in violation of the Eighth Amendment.  As explained above, Cook avers that he is denied "effective medical services [and] adequate mental health care."  He also asserts that when he is scheduled for medical visits, the guards in the RHU cancel his appointments "by lying to the Medical Department telling them that [Cook] refused the appointment."  In addition, he claims that dental care "is essentially non-existent" and

-18-

that he has not seen a dentist in over four years.  He states
that he receives no mental health treatment.

The conditions to which inmates are exposed must be
humane, although "[t]he Constitution 'does not mandate
comfortable prisons.'"  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832
(1994) (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981)).
Accordingly, in barring the infliction of cruel and unusual
punishments, the Eighth Amendment prohibits prison officials
from using excessive physical force and compels them to "ensure
that inmates receive adequate food, clothing, shelter, and
medical care."  <u>Id.</u>  They must also take reasonable steps to
ensure the inmates' safety.  <u>Id.</u>

To establish that prison conditions amount to cruel
and unusual punishment, a plaintiff must satisfy a two-part test
consisting of objective and subjective components.  <u>Farmer</u>, 511
U.S. at 834.  The objective component requires a showing that
the conditions to which the plaintiff has been subjected are
"sufficiently serious," resulting in a denial of "the minimal
civilized measure of life's necessities."  <u>Id.</u> (quoting <u>Rhodes</u>,
452 U.S. at 346).  In determining whether this objective
component is satisfied, courts focus on whether the conditions
contravene "the evolving standards of decency that mark the
progress of a maturing society."  <u>Id.</u>  The subjective component,
in turn, implicates the defendant's state of mind, requiring a

-19-

plaintiff to show that the defendant was deliberately indifferent to his health or safety.  Id.  Courts are permitted to infer the existence of deliberate indifference "from the fact that the risk of harm is obvious." Hope v. Pelzer, 536 U.S. 730, 738 (2002).

It is well established that "deliberate indifference to serious medical needs of prisoners" amounts to cruel and unusual punishment in violation of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Our Court of Appeals has noted that "even in less serious cases, where [a] prisoner does not experience severe torment or a lingering death, the infliction of unnecessary suffering is inconsistent with standards of decency" under the Eighth Amendment.  Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).  If "unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the [E]ighth [A]mendment." Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (internal citations and quotation marks omitted).

There is no evidence in the record to support Cook's position.  To the contrary, it is undisputed that nurses visit the RHU twice a day, that Cook receives prescription medications on a regular basis, and that he received a physical examination

-20-

in 2015.  Indeed, Cook has been seen by medical staff too many times to recall during the past year.  It is also undisputed that Cook refuses to receive dental care because he objects to SCI Graterford's policy of restraining Capital Case inmates while they are undergoing dental examinations.  Finally, the record establishes without any contrary evidence that Cook met with mental health providers on at least several occasions in 2015 and that he is not presently being treated for any mental health issues.  While Cook may disagree with the determination of the mental health staff that he does not suffer from any mental illness, prison authorities are entitled to "considerable latitude in diagnosis and treatment of prisoners."  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

Cook points to no evidence that he has been denied "the minimal civilized measure of life's necessities" through substandard medical, dental, or mental health care.  See Farmer, 511 U.S. at 834 (quoting Rhodes, 452 U.S. at 346).  Nor has he shown that any defendant was deliberately indifferent to his medical, dental, or mental health needs.  See id.  Accordingly, there is no genuine dispute of material fact as to Cook's Eighth Amendment claim based on lack of access to medical, dental, and mental health care, and Wenerowicz is entitled to summary judgment on that claim.  See Estelle, 429 U.S. at 104.

V.

Finally, we assess whether Wenerowicz is entitled to summary judgment on Cook's Eighth Amendment claim insofar as it is based on the allegedly substandard food and conditions of meal service. Cook claims that he has been subjected to cruel and unusual punishment in that the trays on which his meals are served are often "filthy" and that the food is rotten, so much so that he has become ill on several occasions.

Allegations of substandard food in the prison setting can, under certain circumstances, give rise to a claim under the Eighth Amendment. See, e.g., Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983); Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980); Reznickcheck v. Molyneaux, No. 13-1857, 2014 WL 133908, at *3 (E.D. Pa. Jan. 15, 2014); Brown v. Sobina, No. 08-128, 2009 WL 5173717, at *7 (W.D. Pa. Dec. 29, 2009). In order to plead such a claim, a plaintiff must aver that he suffered a "discrete and palpable injury" as a result of the alleged deprivation. Brown, 2009 WL 5173717, at *7; see also Robles, 725 F.2d at 15.

Nothing in the record shows that Cook suffered a "discrete and palpable injury" due to the condition of the food served or the cleanliness of the trays. See Brown, 2009 WL 5173717, at *7. All that is shown is that Cook observed trays that were not properly cleaned, something that Wenerowicz never

-22-

observed, and that on some occasions Cook was served small portions or did not receive the fruit and juice to which he was entitled. Since there is nothing in the record showing a "discrete and palpable injury,"[8]  Cook has not established an Eighth Amendment violation based on the conditions of meal service, and Wenerowicz is entitled to summary judgment on that claim.  See id.

VI.

Having concluded that there are no genuine disputes of material fact and that Wenerowicz is entitled to summary judgment with respect to Cook's Eighth Amendment claims based on his alleged lack of access to medical, dental, and mental health care and on the allegedly substandard conditions of the food and meal service in the RHU, we need not reach the argument of Wenerowicz that he lacked the requisite personal involvement in the alleged Eighth Amendment violations to be liable under § 1983.  For the same reason, we need not reach the argument of

_____

8.   The only indication that Cook experienced any injury as a result of the conditions of meal service are a grievance form and a letter to Wenerowicz which Cook attaches as exhibits to his Amended Complaint.  In these documents, Cook complains about the condition of the meal trays and explains that he has had to skip a number of meals because the trays were so dirty. We cannot consider these unsworn statement as part of the record for summary judgment purposes.  See, e.g., Yan Yan v. Penn State Univ., 529 F. App'x 167, 170 (3d Cir. 2013); Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989).

Wenerowicz that Cook failed to exhaust his administrative remedies with respect to the Eighth Amendment claims.